

UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| JOHN J. RILEY, | ) | |
| | ) | |
| PLAINTIFF | ) | |
| | ) | |
| v. | ) | |
| | ) | CIVIL NO. 2:15-CV-37-DBH |
| PORTLAND MAINE AREA LOCAL | ) | |
| NO. 458 AMERICAN POSTAL | ) | |
| WORKERS UNION AFL-CIO AND | ) | |
| TIMOTHY DOUGHTY, | ) | |
| | ) | |
| DEFENDANTS | ) | |

FINDINGS OF FACT AND CONCLUSIONS OF LAW

On September 6 and 7, 2016, I conducted a bench trial.  These are my findings of fact and conclusions of law.  <u>See</u> Fed. R. Civ. P. 52(a).[1]

FINDINGS OF FACT

*Governing Documents*

1.     The American Postal Workers Union (APWU) Constitution and Bylaws provide that Union members who retire "may maintain full membership with all rights of such membership by continuing to pay full per capita taxes to the APWU plus whatever local dues may be required by their local union."  Pl. Ex. 42, art. 3, § 4(b).

---

[1] There is no transcript, but I rely on the testimony that I heard at trial.  Throughout this decision, I also cite specific exhibits.  At trial, I admitted Pl. Ex. 47 de bene.  I now sustain the defendants' objection to that exhibit.  The document is hearsay (stating the views of Wayne Poland, who did not testify) and not admissible for impeachment.

2.     For APWU members on the United States Postal Service payroll, all Union dues are subject to automatic payroll deduction and transmitted directly to the Union.  No such procedure is available for retirees who are no longer on the Postal Service payroll.

3.     The APWU's national Secretary-Treasurer is directed to "supervise the recording of the membership of each local union." Id. art. 7, § 1(c).

4.     The APWU Constitution provides that "[r]etirees whose full dues/per capita payments have lapsed due to extenuating circumstances may appeal for reinstatement to the national Secretary-Treasurer [with supporting documents]." The Retirees Department Director then makes a recommendation to the national Secretary-Treasurer, who presents it to the National Executive Board for a final determination.  Id. art. 3, § 4(d).

5.     For local elections, each local union establishes its own election committee, and "[t]he election committee shall be responsible for the conduct of local elections and shall decide all controversies arising out of the election processes." Id. art. 12, § 8.

6.     APWU's Portland Maine Area Local No. 458 (Local 458) has its own Constitution.   It  provides—almost  identically  to  the  national  APWU Constitution—that "[r]etired members may retain full membership with all rights of such membership by continuing to pay full per-capita tax to the APWU plus whatever Local dues may be required by this Local." Pl. Ex. 41, art. III, § 1(C). It also provides that "[r]etired members may retain partial membership by paying three (3) dollars per year per-capita tax to the National Union.  Such retirees

shall have neither voice nor vote." <u>Id</u>.  It has no provisions concerning failure to pay dues.

       7.     On the amount of dues, Local 458's Constitution provides:

> The dues for each Active member shall be Eleven dollars and Ninety-Seven cents ($11.97) per pay period effective November 27, 1993, plus any future increases by the National Union.  The dues of each Honorary member shall be Seven dollars ($7.00) per pay period effective April 13, 1996, plus any future increases by the National Union.  The dues of each Retired member shall be Three dollars ($3.00) per year payable in advance.

<u>Id</u>. art. VII, § 1.

       8.     Local 458's Constitution provides that enumerated officers "shall be reimbursed the payment of dues." <u>Id</u>. art. V, § 1 (General President); § 2 (General Vice-President); § 3 (General Recording Secretary); § 4 (General Treasurer); § 5 (Clerk Craft Director); § 6 (Assistant Clerk Craft Director); § 8 (Motor Vehicle Craft Director); § 10 (Human Relations Representative); § 11 (Legislative Aide); § 12 (APWU Health Plan Representative, using variant language "will have his/her dues refunded.").

### *Chronology*

       9.     The plaintiff John J. Riley retired from the Postal Service on January 31, 2013.  Until then he had been a member in good standing of both Local 458 and the national APWU for many years and had served in several leadership roles for Local 458, including that of President.

       10.    Earlier that month Riley emailed both the Secretary and the Treasurer of Local 458 stating that he intended to remain an active member.  In March he submitted paperwork to the APWU national office electing full retiree

membership.  He also emailed Local 458's President, the defendant Timothy Doughty, that he intended to keep full retiree membership.

11.    After his retirement Riley ultimately arranged to pay his national dues directly to the APWU national offices.  He received and paid quarterly invoices from the APWU for payment of national dues.

12.    There was confusion or dispute within Local 458 over what local dues retirees must pay to remain active members.  Interpreting the language "whatever local dues may be required by their local union," the defendant Doughty believed that retirees must pay the same local dues as Local 458 required of active members.  On the other hand, Local 458's Treasurer Gilchrest believed and informed Riley in 2013 that Riley owed no local dues because Local 458 had never required retirees to pay local dues.  Pl. Ex. 5.  Gilchrest based his 2013 determination upon research into the available Local 458 records.  But before Riley's retirement, there had been only one other retiree who maintained full membership, Wayne Poland.[2]  He had not paid dues after retirement, but there were varying explanations.  At one point while Riley was President, the membership of Local 458 voted that Poland should not have to pay dues because

---

[2] Some testimony and exhibits referred to a Douglas King who wanted to remain a full member after retirement in 2009.  See Def. Exs. 2, 42.  Apparently Riley as President hung onto King's check for national dues because the APWU had not yet billed the national dues for retirees on account of a large number retiring at once.  Thereafter, the APWU designated King as not having paid dues when Local 458 notified the national offices that King had been elected to local office.  It appears that initially Doughty (who by then had become President) asked King for a new check, directing that the previous check be voided.  Def. Ex. 42.  But then a dispute arose between King and Doughty over the wording of a letter that King sent with his new check (the letter was not introduced into evidence).  See Def. Ex. 2.  Doughty rejected King's new check and told King that he could not hold office.  Id.  Apparently King then desisted from his attempt to remain a full member.  King did not testify, only some of the documents were admitted, and the testimony among Doughty, Riley, and Gilchrest was inconsistent.  I am unable to draw any inferences about Local 458 policy from the treatment of King.

of his many past contributions to the Union.  As a result, at that point Local 458 paid Poland's national dues.  In 2004, Local 458 revoked that waiver by vote of the membership.  Def. Ex. 1.  For a time, another member paid Poland's national dues.  Poland never paid any local dues as such.  For many periods he held an officership position where such dues would have been reimbursable/refundable in any event.  Doughty believed that it would have been pointless to require Poland to pay local dues only to have Local 458 turn around and write a check to Poland in the same amount.  Pl. Ex. 33.  Riley (a past President), on the other hand, said that Local 458 treated Poland as never having to pay local dues as a retiree at all.  He also testified that if there is a right to reimbursement or refund, a retired member must first pay the dues and then be reimbursed, because the reimbursement is for services rendered and therefore is taxable income to the member unlike a dues waiver.  Doughty agreed on the tax issue.  A Local 458 Executive Board member, Donald Parks, testified that at one time he believed that under both Constitutions, the Local membership could vote to have retirees pay whatever Local 458 decided—for example, half the active dues or no dues at all.  But he had learned that his interpretation was wrong after talking to "most of our national executive board members, including president Dimondstein," and now believes that local dues for retirees must be the same as for active members on account of the national Constitution.  Poland at one time maintained that Local 458's Constitution required him to pay only $3 per year to remain a full retiree member.  At various times Doughty and Gilchrest expressed the view that Local 458's Constitution did not adequately address the issue.  Pl. Exs. 3, 5.

5

Change in the Constitution would require the membership to consider the issue. Pl. Exs. 5, 41 art. XI.  All the relevant actors agreed that in any event the retirees Poland and Riley should be treated equally.  Pl. Exs. 3, 4; Def. Ex. 45.  Doughty also told Riley in 2013 that there was no rush to resolve the issue.  Pl. Ex. 4.

13.    Riley told Doughty on March 13, 2013 that he would provide a $175 check for unspecified dues.  Riley did not in fact provide that check.[3]  Later, however, in January 2014, aware of potential controversy over retiree payment of local dues, he did provide Local 458's Treasurer Gilchrest a local dues check for $350 so that no one could challenge his eligibility in the upcoming 2014 union election in which Riley planned to be a candidate for certain Local 458 positions.  Pl. Exs. 5, 6.  Gilchrest never cashed that check.  He believed that retired members had never paid Local 458 dues.  Pl. Ex. 5.

14.    In December 2013, Riley began filing election challenges regarding the upcoming Local 458 election.  At least some of these, including the one that would later become the subject of a Department of Labor lawsuit, were against the campaign of the defendant Doughty for President.  Riley was running for Vice-President, but he was running on a joint ticket where his running mate opposed Doughty.

15.    In February 2014, Riley filed still more election challenges.

---

[3] When asked if Riley had given him checks for his local dues after he retired, Gilchrest answered "For what amount?  There were several in question."  To the next question, "For $175?"  Gilchrest answered: "No, he did not."  Riley provided Gilchrest a different check that was returned.  See Pl. Ex. 5.  He testified that $121 of that check was for payment of national dues before he learned that he could pay them directly.

16.     Sometime in mid-February 2014, the APWU sent Riley a "National Per Capita Dues Invoice." Pl. Ex. 9. It described dues obligations for all four quarters of 2014. For the first quarter, on the line with the date "03/31/2014," it listed a "Total Due Now" of $24.18, and stated at the bottom of the Invoice "You MUST pay the 'Total Due Now' amount to remain a member in good standing." Id.[4] Riley interpreted the notice to mean that he must pay the $24.18 by March 31—still several weeks away—to remain in good standing.

17.     At 5:28 a.m. on March 1, 2014, someone from Local 458 checked online the APWU's record of active cash paying members, which showed that Riley was paid only through February 28, 2014. Pl. Ex. 8. Doughty testified that he saw the record that same day, but the evidence does not establish who made the early morning inquiry.

18.     On March 12, the day before the election ballots were to be counted, Doughty—as a result of what he had learned from the national office—notified Local 458's election committee that Riley was not a member in good standing because he had failed to pay dues. The election committee chair, Sally Welch, phoned Riley to inform him that he was allegedly delinquent on his national dues. Riley immediately called the national Secretary-Treasurer, Elizabeth Powell. She allowed Riley to use a credit card that very day to come current on his national dues and pay future national dues through June 30, 2014. Thereafter on that same day, March 12, the national Secretary-Treasurer

_____

[4] The $24.18 reflected a trailing balance of $2.27 as of February and a $21.91 balance for March. After Riley's earlier advance dues payment, made on November 22, the national dues had increased—hence the minimal underpayment for February.

emailed President Doughty, who in turn forwarded her email to Local 458's election committee chair, stating that Riley was fully paid on his national dues through June 2014.  Pl. Ex. 10.  Local 458's election committee then determined that Riley was a member in good standing for purposes of the election.  There was no reference to Local 458 dues during these March 12 events and communications.

19.    When the ballots were counted on March 13, Doughty was elected President and Riley lost his Vice-Presidential contest.

20.    Riley presided at the April 5-6, 2014 state convention as State President, with his term expiring at the end of the meeting.  At that convention, Poland was elected State Treasurer for the year ahead. The offices of State President and State Treasurer do not qualify for dues reimbursement under Local 458's Constitution, see ¶ 8 above.

21.    The national APWU rejected Riley's election challenges, but the Department of Labor decided to pursue one of them.  On April 30, Doughty asked Local 458's Secretary to communicate with the Department of Labor's assigned investigator about that election challenge.  Pl. Ex. 21.

22.    Thereafter, things began to heat up.

23.    On May 7, 2014, Doughty wrote to APWU national Secretary-Treasurer Powell, challenging Riley's good-standing status and insisting that Riley's national membership had lapsed as of March 1, 2014.  Def. Ex. 11.  Doughty believed that if Riley was not a member in good standing, he could not

pursue his election challenges.  Def. Ex. 14.  The national Secretary-Treasurer did not respond to Doughty.

24.     On May 9, Doughty reported to the members ("Membership Update") that Riley and his running-mate "have filed a total of 6 challenges to the last local election.  Their challenges have all been rejected by the Election Committee.  I have not been provided any details or a copy of their challenges, but I expect that both have appealed to the National APWU and will continue to appeal to the Department Of Labor as well. . . .  The local elections have cost the local approximately $5,000.00 so far."  Pl. Ex. 22.

25.     There was testimony about a May 9 Union meeting,[5] but no minutes were provided and Doughty testified that he could recall no vote being taken.  Doughty testified that at the meeting there was great controversy over Wayne Poland having an officership position (State Treasurer) while not paying Local 458 dues, because his entitlement to local dues reimbursement as an officer expired April 1.  But in his May 9 Report to Membership, Doughty was more restrained, stating: "Members have raised concerns of local union dues not being paid by retirees while retaining a voice and vote.  We are planning to address how the constitutional language applies and to address any conflicts.  There is a bit of disagreement regarding how this was handled in the past, or at least how the rules were thought to have been historically applied."  Id.

---

[5] In his May 11 email quoted in ¶ 26, Doughty refers to the membership meeting as "last Thursday."  Thursday was May 8 in 2014.  But the date discrepancy makes no difference.

26.   On May 11, 2014, Doughty engaged in an email interchange with the APWU's Northeast Regional Coordinator that showed that Doughty was much more exercised.  He stated:

> I have two cash pay retiree's; Wayne Poland & John Riley.  Neither have paid their local share of dues for a long time, *and I never really addressed it.*  A member raised the issue at the General Membership Meeting last Thursday and basically the policy has been applied loosely, (especially with Mr. Riley).  Wayne was a local Health Plan Rep (and would have gotten his dues returned) and he was also the State Sec/Treasurer.  Riley was the State President.  Now Wayne is still the State Sec/Treas and *Riley is still a pain in my ass. . . .  Riley and Taddeo are still challenging the last Local Elections with the Department of Labor and there are five more challenges pending.  The election has cost the Local about $5k so far and it came up at the meeting that he is pressing all this bullshit yet he doesn't even pay local dues.*  There was a decent discussion back and forth but basically it is up to me to decide what to do. . . .
>
> *When I met with the DOL investigator I maintained that Riley isn't a member-in-good-standing but I don't think the DOL is buying it since Wayne hasn't paid his dues either.*

Def. Ex. 14 (emphasis added).  Then later in the same email string he stated:

> Our local copies the National pretty much but the retirees read "whatever Local dues may be required by this Local" as meaning that if the president doesn't require them to pay then they don't have to . . . *past presidents have applied it differently and since we only had one retiree (Poland) for a long time then it wasn't really on the top of the "to do list".  Now we have two retirees and they both are a pain in the ass.*
>
> *Riley had let his National dues lapse this past March. I complained to the per-capita and to the Sec/Treas.  Liz verified his non-payment status, so I raised his non-member status to the Election Committee.  Then for some reason, out of the blue Liz allowed Riley to pay late and I felt she threw me under the bus . . . .  I wrote to her again about his status last week, but she hasn't replied.  So I'm guessing she [is] a Riley fan (even though he campaigned against her . . . go figure).*

Id. (emphasis added).

27.   Two days later, on May 13, 2014, Doughty was even more exercised.

He emailed the National's Secretary-Treasurer:

> For your review I attached just one of the many hate filled flyers that were distributed by John Riley & John Taddeo in the last election.  I also attached the only two campaign flyers that were sent out by Kathy Condon and myself.  As you can see, Kathy and I remained positive while the Riley/Taddeo team engaged in vicious attacks in writing, and their verbal assaults were even more venomous.  Fortunately the membership saw through the personal attacks and Kathy and I won by a comfortable margin (192 to 130).  While Kathy and I have attempted to mend the fences, *Riley and Taddeo have responded by submitting six separate challenges to the local election, three of which have been appealed to the Department [of] Labor and three more are expected to be appealed soon.  Riley and Taddeo continue to generate the strife that is destroying a great local.*
>     *Most of the animosity is being generated by retiree John Riley and he is doing this at the same time that he has allowed his dues to lapse.  As you know I have questioned his membership status.  How can we allow someone who doesn't pay his dues to destroy our Union?*  In this regard today I will be sending Mr. Riley the attached letter.  He is not a member in good standing in this Union and the record should reflect his non-member status.

Def. Ex. 40 (emphasis added).

28.   On that same date, May 13, 2014, Doughty mailed Riley a letter

stating:

> Please be advised that you have failed to maintain your full dues in the American Postal Workers Union.  Based on the records available to me you have allowed your dues to lapse and as such you are not a member in good standing of this Union.  You have not paid your local dues since March of 2013 and on March 1st 2014 you allowed your national dues to lapse.

Pl. Ex. 1.   There was no reference to the treatment of Poland or to Riley's

uncashed $350 check[6] or to any ambiguity in the Constitution.  The letter, which

---

[6] The defendants' Proposed Findings, ECF No. 81 at 5, say that "Gilchrest ultimately rejected this check as it was too late," but the admitted evidence does not establish that proposition.

was circulated to numerous recipients including the Department of Labor, went on to describe how Riley could appeal for reinstatement if the "lapses were due to extenuating circumstances." Id.

29.    On May 14, the next day, Doughty emailed Poland:

> It is my view that the Constitution requires full dues to remain an active member. Full dues means national and local dues. When you were a local officer your dues were reimbursed so exchanging dues monies back and forth was somewhat pointless. Since you are no longer entitled to reimbursement you need to make arrangements to ensure your national and local dues are paid.

Pl. Ex. 33. Doughty did not tell Poland that he was no longer a member in good standing. Unlike his May treatment of Riley, not until June 20 did Doughty declare Poland's membership to have lapsed, and then he copied no one but Treasurer Gilchrest. Pl. Ex. 34.

30.    Despite numerous attempts by Riley, and later Riley's lawyer with a newly tendered check for local dues, Doughty refused to rescind the determination that Riley was no longer a member in good standing.

31.    Doughty's term as President expired in late 2015, but the Union has never rescinded the letter declaring Riley to be no longer a member in good standing.

32.    I find that Doughty did not have the authority to determine Riley's dues paying status for the national APWU. Doughty also did not have the authority to overrule the APWU's national Secretary-Treasurer's decision on March 12 to allow Riley to bring current that day his arguably minimally late

---

Admitted evidence shows only that Gilchrest did not believe that Riley had to pay Local dues. Pl. Ex. 5.

payment.  The defendants have pointed to no such authority for Local 458's President in the Constitutions; instead the control of the membership rolls lies with the national Secretary-Treasurer, Pl. Ex. 42, art. 7, § 1(c),[7] and Doughty had not received any response from her to his letter of May 7, 2014.  The invoice that the national office sent to Riley stated that he must pay the invoiced amount "to *remain* a member in good standing," Pl. Ex. 9 (emphasis added),[8] not to seek reinstatement.   It was reasonable for Riley to conclude that he had until March 31, 2014, to pay the "Total Due Now" appearing on the line with the date "03/31/2014."   His understanding was confirmed by the national Secretary-Treasurer's willingness to accept his payment via credit card on March 12, 2014, and her immediate notification thereafter to Local 458 that Riley was fully paid through June.  Pl. Ex. 10.  Local 458's Election Committee thereupon ruled that Riley was a member in good standing for election purposes, a decision that it had the authority to make.  Pl. Ex. 42, art. 12, § 8.  The national APWU has treated Riley as a member in good standing for the years 2013-2016, issuing him

---

[7] Article V(1) of Local 458's Constitution states: "It shall be the duty of the President to have charge of the general welfare of the Local and to promote its interest."  I find nothing there that gives Doughty a role in determining APWU *national* membership.  Interestingly, Doughty testified at trial as follows:

> Q. I'm trying to talk about national dues.  Do you have any basis to dispute John's testimony under oath and the records that show that he's continually paid his national dues, in fact beyond today?
> A. I don't administer the national dues so I . . . [d]on't think I'm qualified to answer that question.

[8] Pl. Ex. 45 shows that the national APWU also grants a grace period for delinquent dues: upon the mailing of a quarterly invoice for a member whose dues are delinquent, that member has 30 days to come current before the arrearage impacts their membership.  This stands contrary to Doughty's view that there is no grace period, not even for a single day.  See Def. Ex. 11.  But since Pl. Ex. 45 is dated July 11, 2016, I do not rely on it for the practice in 2014.

membership cards for each year.  Pl. Ex. 29.  Doughty's contrary treatment was because of Riley's irritating election challenges, and it was retaliatory.

33.    With respect to Local 458 dues for active retirees, their nonpayment by Poland and Riley was a practice that, in Doughty's words to the Northeast Regional Coordinator, had gone on "for a long time," without being "really addressed."  Doughty has an explanation for Local 458's treatment of Poland that is consistent with his view that retirees are supposed to pay Local dues, namely, that Poland would have been entitled to reimbursement for the period he was an officer and that it was pointless to engage in an exchange of checks. On that theory, Poland would have to pay dues only after April 1, 2014, when he ceased being an officer of the type whose dues were reimbursed.  But that seems inconsistent with Doughty's recognition on May 11 that Poland, like Riley, had not paid Local 458 dues for a "long time."  During much of this time, Poland wrote national dues checks for Local 458 to pass on to the national APWU, and then was reimbursed later.  Moreover, the language of Local 458's Constitution states that certain officers' dues can be "reimbursed" or "refunded," see ¶ 8 above, not that they can be waived altogether.  I find that the past practice, for good or ill, was *not* to require active retirees to pay Local 458 dues even though there was some confusion as to why.

34.    I also find that in previous exchanges with Riley, Doughty had stated that Local 458's Constitution did not adequately address the issue of retiree payment of Local 458 dues and that "this is something that we may want to consider in the future."  Pl. Exs. 3, 4.  He had also told the membership that

"[w]e are planning to address how the constitutional language applies and to address any conflicts.  There is a bit of disagreement regarding how this was handled in the past, or at least how the rules were thought to have been historically applied."  Pl. Ex. 22.  But Doughty did not pursue that avenue.  Instead, in May, Riley's election challenges had come to the forefront in Doughty's hostility toward him, as demonstrated clearly and graphically in Doughty's emails to the Northeast Regional Coordinator and the national Secretary-Treasurer.  Doughty testified that his conduct was motivated in part by members' complaints, yet the evidence shows that Poland (serving as State Treasurer while not paying local dues) was as much or more of a concern for members.  In mid-May, Doughty was treating Riley more harshly than Poland.  I find that Doughty's decision in May 2014 to abandon, without notice to Riley, his "no rush" stance by declaring Riley no longer a member in good standing— without pursuing amendment of Local 458's Constitution and despite Riley's tendered check of $350—was retaliatory.  It was provoked by Doughty's (and perhaps other members') unhappiness over the grief that Riley had been causing Doughty and Local 458 in making election challenges, and Doughty's hope that declaring Riley a lapsed member might bring an end to the election challenges.

35.    The APWU national office named Riley an arbitration advocate in Maine for the years 2014 and 2015.  Pl. Exs. 27, 28.  Arbitration advocates are used by the Union if the business agents are too busy to handle arbitration cases.  According to Union policy, Riley could earn a maximum of $10,000 per year, but from past experience he expected to earn $5,000-$6,000 per year.  Riley could

not serve as an arbitration advocate after May 13, 2014, once Doughty declared him not a member in good standing,. The State President Scott Adams, however, testified that all appointments to particular cases required his approval and that during 2014 through 2016 there was no need for any arbitration advocate in Maine and none was appointed.

36.    Riley's Union membership was very important to him. It was one of the activities in which he had planned to spend his retirement years, and his future has been "inhibited" by his lack of union membership.

37.    Riley testified that "[t]he local union, particularly Mr. Doughty, has been promulgating slanderous accusations against me that I am not a member and basically I'm what they call a scab." Setting aside hearsay issues (he did not testify that he, Riley, heard any such accusations directly), Riley's description of the "slanderous accusations" is very vague. Riley presented no evidence of specific conversations that anyone heard and no one testified that Doughty used the word "scab" in describing Riley.[9]  The testimony is insufficient to establish defamation or compensable emotional distress.

38.    One of Riley's election challenges resulted in the Department of Labor suing Local 458 in this court in August of 2014. The case was settled, as

---

[9] Doughty's March 17, 2015, Membership Update states: "Retiree John Riley has filed a law suit against the Local as well as against me personally. The conflict involves non-payment of union dues and membership status. We have 20 days to formulate the Locals official response and I will be working to answer the complaint with our attorney Gregg Frame." Pl. Ex. 38. The April 15 Membership Update states: "The Portland Maine Area Local 458 was served again by the Cumberland County Sheriff Office with a duplicate law suit on March 17th. The lawsuit was filed by retiree John Riley over the requirement to pay union dues." Pl. Ex. 39. Those factual statements do not constitute slander.

16

a result of which a new election was held, and Riley once again lost his campaign for Vice-President.[10]

39.    In September 2014, Riley attempted to pursue Union remedies.  He sent his charges by certified mail to both the Secretary and the Treasurer of Local 458.  Doughty instructed them not to pick up the certified mail, Pl. Ex. 16, and Doughty himself did not pick it up.  As a result, the certified mail was returned unopened to Riley.  At trial, Doughty justified his conduct on the basis that by virtue of Riley's dues lapse, he was no longer a Union member and thus had no such relief available to him.

40.    Riley never pursued formal reinstatement, in part because he believed that doing so would require an admission that his membership had lapsed.

## CONCLUSIONS OF LAW

### *Jurisdiction*

A.    Riley filed this lawsuit under the Labor-Management Reporting and Disclosure Act against Local 458 and its then-President Doughty, claiming violations of 29 U.S.C. §§ 411 and 529, and seeking remedies under 29 U.S.C. § 412.  Federal question jurisdiction exists under 28 U.S.C. § 1331.

---

[10] In the course of that election, Sharon Hanley, chief of the enforcement division of the Department of Labor's Office of Labor-Management Standards, determined that Riley was a union member in good standing.  Perez v. Portland Area Local No. 458, Am. Postal Workers Union, No. 2:14-cv-00320-JDL, ECF No. 36.  Neither party has argued that collateral estoppel, primary jurisdiction, or any other doctrine makes that determination relevant here, and I therefore do not use that determination in any way in this decision.

***Exhaustion of Remedies***

B.     The discretionary reinstatement route that Doughty offered Riley was not an adequate remedy.  It would have required Riley to admit that his Union membership had lapsed, perhaps forfeiting his election challenges.

C.     I conclude that Riley did all that he could to invoke internal union remedies before filing his lawsuit, including sending copies of his complaints and accusations to Local 458's Secretary and Treasurer by certified mail directed to Local 458's post office box.  President Doughty directed the union officials not to pick up the certified mail, and it was eventually returned unopened to Riley.  At trial Doughty claimed that under the local and national Constitutions Riley was not entitled to make these complaints to local union officials because his alleged dues lapse made him no longer a member.  Thus, either Riley did all that he could to exhaust available administrative remedies, or no adequate remedy existed for him.  Moreover, cases interpreting the statutory provision on exhaustion of remedies, 29 U.S.C. § 411(a)(4), commit to the court's discretion whether the plaintiff satisfied the requirement.  Under the circumstances here, I do not require further exhaustion.  See Achilli v. John J. Nissen Baking Co., 989 F.2d 561, 564 (1st Cir. 1993) (union cannot insist that a member "exhaust a remedy that does not exist"); Doty v. Sewall, 908 F.2d 1053, 1061 (1st Cir. 1990) (referring to the "discretionary exhaustion doctrine"); Alfego v. Exec. Bd. of Local No. 143, Am. Fed'n of Musicians, 747 F.2d 64, 65 (1st Cir. 1984) (only the court and not the union can require exhaustion, which is discretionary); Stein v. Mutuel Clerks' Guild, Inc., 560 F.2d 486, 490 (1st Cir. 1977) ("[I]t can hardly be

18

argued that [plaintiffs] had any internal Guild procedures available to them at the time they brought this action, for they had been entirely expelled . . . .").

### *Liability*

D.      Riley claims in Count I of his Complaint that Local 458 and Doughty changed the retiree dues structure in violation of 29 U.S.C. § 411(a)(3)(A).  That subsection provides that dues "shall not be increased" except upon proper notice and "by majority vote by secret ballot of the members in good standing."  29 U.S.C. § 411(a)(3).  Riley argues that Doughty's decision to require full local dues payments by retirees changed the existing retiree dues structure, Compl. ¶ 23, inasmuch as no previous retiree member had to pay Local 458 dues at all.

The answer to this question depends on the meaning of the national and local Constitutions, as well as interpretation of the past practice of Local 458.  I am troubled about deciding the meaning of the APWU Constitution.  The national APWU is not a party to this lawsuit, and I therefore am reluctant to determine what its constitutional language means in the absence of argument by the APWU and whatever evidence or documents it might have about ambiguous terms or past interpretations of its Constitution.  I base my decision upon Local 458's Constitution and Local 458's past practice.

On its own, the language of Local 458's Constitution is certainly ambiguous.  One might reasonably read "full per-capita tax to the APWU plus whatever Local dues may be required by this Local" as giving Local 458 the authority to establish a different structure of local dues for retirees.  That is what Don Parks, a clerk craft director and member of the executive board, believed at

19

one time according to his testimony.  Alternatively, because the language about "whatever Local dues may be required" appears in a provision that grants retirees full Union membership with all rights of such membership, one could reasonably conclude that the provision refers to whatever local dues Local 458 requires of active members, in contrast to the $3 option for retirees who are not preserving their voice and vote and only remain on the membership rolls for social and fraternal purposes.

The Department of Labor's policy under the LMRDA is that "[t]he interpretation consistently placed on a union's constitution by the responsible union official or governing body will be accepted unless the interpretation is clearly unreasonable."  29 C.F.R. § 452.3 (2016).  The First Circuit has said that "judges should refrain from second-guessing labor organizations in respect to plausible interpretations of union constitutions."  Local 48, United Bhd. of Carpenters & Joiners v. United Bhd. of Carpenters & Joiners, 920 F.2d 1047, 1052 (1st Cir. 1990); accord McPhetridge v. IBEW, Local Union No. 53, 578 F.3d 886, 891 (8th Cir. 2009) ("To resolve Plaintiffs' 'due process' claims, a reviewing court must interpret provisions of the IBEW Constitution and the practices of Local 53 . . . These inquiries are best conducted, in the first instance, by unions themselves."); see also Determining Breach of Fiduciary Duty under the Labor-Management Reporting and Disclosure Act: Gabauer v. Woodcock, 93 Harv. L. Rev. 608, 612-13 (1980) (discussing the variety of ways in which courts approach the interpretation of union constitutions).

There is no doubt that before this controversy, Local 458 had not required its only active retiree Poland to pay local dues as such, but different people have different explanations for why.  One past President, Riley, said that Local 458 had consistently waived Poland's local dues after his retirement.  It was also Treasurer Gilchrest's view that Local 458 had never required a retiree to pay Local dues.  President Doughty, on the other hand, took the position that retired members had to pay full Local 458 dues, while admitting that the Constitution might not address it satisfactorily.  As for "interpretation consistently placed on" the Constitution (the words of 29 C.F.R. § 452.3), Executive Board member Donald Parks testified that his original understanding was that Local 458 could require active retirees to pay less than full dues, but that his opinion had changed.  Even Doughty admitted that "past presidents have applied [the Constitution's provision on Local dues] differently," that he "never really addressed" the issue, and that for Local 458's two retired cash pay members, "[n]either have paid their local share of dues for a long time."  Def. Ex. 14.

In ¶ 33 above, I found for the reasons stated there that the past practice was *not* to require retirees who remained active members to pay Local 458 dues.  I can well understand that Local 458 might want to change that policy, but section 411(a)(3) requires that such a change occur only by secret ballot of the members after proper notice.  In the absence of such a vote, I conclude that the past treatment of active retiree members is that they were not required to pay Local 458 dues.  Thus, with respect to Count I, requiring Riley as an active retiree

to pay full Local 458 dues was a dues increase contrary to the procedures spelled out in 29 U.S.C. § 411(a)(3)(A).

E.     Riley claims in Count II[11] of his Complaint that Local 458 and Doughty retaliated against him for his election law challenges in violation of 29 U.S.C. § 529.  That statute provides:

> It shall be unlawful for any labor organization, or any officer . . . to fine, suspend, expel, or otherwise discipline any of its members for exercising any right to which he is entitled under the provisions of this chapter.

29 U.S.C. § 529.  Department of Labor regulations state that that this provision applies to "rights relating to the election of officers under title IV."  29 C.F.R. § 452.10 (2016).  Riley asserts that his treatment was designed "to suppress dissent" and deprive him of his rights under the bill of rights of members of labor organizations, 29 U.S.C. § 411, "including the right to have equal rights and privileges within the Local and his rights of freedom of speech and assembly." Compl. ¶ 26.[12]  Section 411 provides:

> Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions . . .

29 U.S.C. § 411(a)(2); see 29 C.F.R. § 458.2(a)(2) (2016).  According to the First Circuit:

> As applied to members, § 411(a)(2) grants an "almost absolute free speech right."  It provides a far ranging protection to the "rights of union members to discuss freely and to criticize the management of their union and the conduct of their officers."

---

[11] I granted the defendants' motion for summary judgment on Count III on February 10, 2016, without objection.  (ECF No. 41).

[12] Section 411(a)(1) deals with equal rights, but in light of my other conclusions I find it unnecessary to determine whether it was violated here.

22

<u>Maceira v. Pagan</u>, 649 F.2d 8, 14 (1st Cir. 1981) (citations omitted).

I conclude that Local 458 and Doughty illegally retaliated against Riley for expressing his views, arguments, and opinions. Specifically, Doughty considered Riley's series of election challenges, one of which the Secretary of Labor adopted and pressed in federal court, to be "bullshit" that made Riley a "pain in the ass" and that were "destroying a great local." Doughty was also upset with Riley's election flyers. By declaring Riley a lapsed member, Doughty hoped to knock the legs out from under Riley's election challenges. There is no other reasonable explanation for Doughty's sudden decision in mid-May to declare that Riley's national membership had lapsed on March 1, when in fact the national APWU and its officers clearly treated Riley as remaining fully paid in his national dues (over Doughty's protests). There is also no other reasonable explanation for Doughty's mid-May decision to depart, without notice, from his earlier stated views—namely that Local 458's Constitution did not adequately address the issue of retiree local dues, that "this is something we may want to consider in the future," and that there was no urgency to resolve the issue. I conclude that Riley's election challenges and election flyers—protected speech—are the reason that Doughty on May 13 declared Riley's Union membership to have lapsed for nonpayment of both national and local dues.[13]

---

[13] I recognize that section 411 also provides:

> No member of any labor organization may be fined, suspended, expelled, or otherwise disciplined *except for nonpayment of dues* by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing.

29 U.S.C. § 411(a)(5) (emphasis added). But that exclusion of dues nonpayment discipline from the statute's notice and due process requirements does not displace section 411(a)(2)'s

***Remedies***

F.     There is no evidence that Riley suffered any economic damages resulting from his improper removal from Union membership.  He believed, on the basis of prior experience, that by virtue of his appointment as an arbitration advocate in Maine he might earn $5,000-$6,000 per year.  According to then-State President Scott Adams's uncontradicted testimony, however, all appointments of arbitration advocates required his approval and, during 2014-2016, there was no arbitration proceeding in Maine to which Riley could have been appointed.  Thus, Riley did not lose any income.

G.     Riley is not entitled to damages for emotional distress.  In the absence of First Circuit precedent, I follow the Second and Ninth Circuits in holding that damages for emotional distress require a physical manifestation of injury, and Riley offered no such evidence.  See Rodonich v. House Wreckers Union Local 95, 817 F.2d 967, 977-78 (2d Cir. 1987) (upholding jury instruction that effectively "prohibited an award of damages for emotional distress or injury to reputation without a finding of physical injury"); Bloom v. Int'l Bhd. of Teamsters Local 468, 752 F.2d 1312, 1315 (9th Cir. 1984) ("a requirement of emotional distress manifested in other actual injury"); Int'l Bhd. of Boilermakers v. Rafferty, 348 F.2d 307, 315 (9th Cir. 1965) ("emotional distress, standing alone" insufficient for damages).[14]  But see Angel v. United Paperworkers Int'l

---

prohibition of union actions to penalize expression of views, arguments, and opinions – actions that Local 458 and Doughty took in Riley's case.

[14] The Fourth and perhaps the Fifth Circuits seem to allow emotional distress damages if there is proof of reputational injury.  See Simmons v. Avisco, Local 713, 350 F.2d 1012, 1019 n.11; Int'l Bhd. of Boilermakers v. Braswell, 388 F.2d 193, 201 n.11 (5th Cir. 1968).  As my findings of fact demonstrate, Riley did not prove reputational injury in this case.

Union Local 1967, 221 F. App'x 393, 402 (6th Cir. 2007) (denying damages in that case, but describing the standard as conduct "sufficiently exceptional or extreme to merit damages for emotional distress"); Murphy v. Int'l Union of Operating Eng'r's, Local 18, 774 F.2d 114, 126 (6th Cir. 1985) (sustaining emotional distress damage award).

H.     Because Riley has proven a violation of his statutory right to free expression but no actual damages, I award him nominal damages of $50.  See, e.g., Rosario v. Amalgamated Ladies' Garment Cutters' Union, Local 10, 749 F.2d 1000, 1007 (2d Cir. 1984) ("plaintiffs might have recovered nominal damages as a matter of right . . . for Local 10's deprivation of the plaintiffs' due process rights"); Farrell v. Hellen, 367 F. Supp. 2d 491, 502 (S.D.N.Y. 2005) (recognizing availability of nominal damages); Perez v. Local Union No. 30, Int'l Union of Operating Eng'r's, 1999 WL 684156, at *7 (E.D.N.Y. 1999) (same).

I.     Punitive damages are available under section 412 "to deter malicious violations of the LMRDA." Doty v. Sewall, 908 F.2d 1053, 1062 (1st Cir. 1990).  Doughty declared Riley a lapsed member in the face of APWU national treatment to the contrary and despite Riley's offer to pay Local 458 dues and tender of checks accordingly.  In doing so, Doughty and Local 458 retaliated against Riley on account of his election challenges and activity, a classic free expression violation.  Such conduct deserves to be deterred, and the timing of the lapsed membership pronouncement—trying to thwart the election challenge by declaring Riley a lapsed member—can only be considered malicious.  That

conduct justifies a modest award of punitive damages.  I award punitive damages in the amount of $5,000.

J.     Riley is entitled to a declaration that the May 13, 2014 letter determining his membership to have lapsed for nonpayment of dues is of no force and effect, and that his membership in good standing in Local 458 has not lapsed.

K.     An injunction shall issue against Local 458 requiring it to rescind the declaration that Riley is a lapsed member and to restore him to good standing.

### *Individual Liability of the Local's President*

L.     Injunctive or declaratory relief cannot be awarded against Doughty because he is no longer President of Local 458.  The question remains whether he can be held liable for damages (in this case the nominal damages of $50 and punitive damages of $5,000 that I have awarded).  The foundational case is Morrissey v. National Maritime Union, 544 F.2d 19 (2d Cir. 1976).  In that decision, Judge Friendly stated: "The few cases on the point have held that [section 412] extends to suits against individual defendants, at least if it is shown that they were acting under color of union authority.  Given the Act's intent to curb the power of overweening union officials, this is clearly the right result."  Id. at 24 (citations omitted); accord Keene v. Int'l Union of Operating Eng'r's, Local 624, 569 F.2d 1375, 1381 (5th Cir. 1978) ("Section 412 extends the jurisdiction of the district court to suits against individual union officials who, acting under color of their union authority, violate the Section 411 rights of union members.");

26

El-Amin v. Blom, 2012 WL 2604213, at *7 (D. Md. 2012) ("[I]ndividual union officers may be held liable for damages for violation of the LMRDA, as long as the officers 'have acted under color of and in abuse of their authority as union officers.'" (citations omitted)); Farrell v. Hellen, 367 F.Supp.2d 491, 501 (S.D.N.Y. 2005); Waring v. Int'l Longshoremen's Ass'n, Local 1414, 665 F. Supp. 1576, 1581 (S.D. Ga. 1987) ("where the officers have 'acted abusively within the scope of their union duties'" (citations omitted)); Rosario v. Dolgen, 441 F. Supp. 657, 676 (S.D.N.Y. 1977) ("[T]he law is clear that individual defendants may be held liable under the L.M.R.D.A. if their improper acts are done under color of union authority."), aff'd in part, rev'd in part sub nom. Rosario v. Amalgamated Ladies' Garment Cutters' Union, Local 10, 605 F.2d 1228 (2d Cir. 1979). Doughty took the retaliatory action at issue here under color of union authority as Local 458's President; that action was an abuse of his authority, and I therefore conclude that he is personally liable.[15]

### Attorney Fees

M.      Riley benefited the Union by vindicating union members' free speech rights under the LMRDA.  He is therefore entitled to reasonable attorney fees. See Hall v. Cole, 412 U.S. 1 (1973); McCafferty v. Local 254, SEIU, 186 F.3d 52,

---

[15] The defendants have cited a few cases that seem to hold the contrary.  One is a District Court case that predates Morrissey.  Some derive from Atkinson v. Sinclair Refining Co., 370 U.S. 238 (1962), where the Supreme Court denied damages against Union officials.  Atkinson, however, involved interpretation of section 301 of the Taft-Hartley Act, 29 U.S.C. § 185, a quite different provision.  I follow Morrissey and the other case law under 29 U.S.C. § 412 that individual Union officers can be held liable even when acting within their Union authority if they have abused that authority.

60 (1st Cir. 1999).  He shall file a motion for such fees in accordance with this District's Local Rule 54.2.

## CONCLUSION

Accordingly the Clerk shall enter judgment in favor of the plaintiff and against the defendants jointly and severally in the amount of Five Thousand Fifty Dollars ($5,050).  The judgment shall also include a declaration that the May 13, 2014, letter determining Riley's membership to have lapsed for nonpayment of dues is of no force and effect, and that his membership in Local 458 has not lapsed.  It shall also enjoin Local 458 to rescind its declaration that Riley is a lapsed member and to restore him to membership in good standing.  The judgment shall also award reasonable attorney fees upon proper submission under Local Rule 54.2.

**SO ORDERED.**

**DATED THIS 5TH DAY OF OCTOBER, 2016**

/s/D. Brock Hornby
**D. BROCK HORNBY**
**UNITED STATES DISTRICT JUDGE**